May it please the Court, my name is Andrew Hurd and I represent Kanyon Holdings, LLC. At this point, I'd like to reserve five minutes for rebuttal. There are two overarching issues on this appeal, categories of issues. The first one is a jurisdictional issue that's implicated by debtors post-confirmation motion to dismiss the underlying appeal, the argument being that when Kanyon withdrew its proof of claim, it mooted the appeal and Kanyon no longer had standing. This argument fails for two reasons. First, Kanyon is still a party aggrieved as outlined by the circuit in the United States Supreme Court. This court can also fashion relief for Kanyon relating to the issues on the underlying appeal. Those appealed issues aren't moot. As to the merits of the underlying appeal, first, the bankruptcy court erred in rejecting Kanyon's non-executory stock purchase agreement. There were obligations due and owing only from the debtor's side and as a matter of law, that contract is not executory and not subject to rejection. Additionally, the rejection of the stock purchase agreement is not a benefit to the estate, and so the court erred in finding that as well. On the appeal regarding the motion for relief from stay, the — there are two avenues for reversal of that opinion. First is under 362 D.1. This party may be relieved from the automatic stay for cause. In this case, the debtor's bad faith in filing this is evidenced by his prepetition conduct as well as his admission that the point of this bankruptcy was to avoid the consequences of the stock purchase agreement, evidence that bad faith. Additionally, under 362 D.2, debtor lacks any equity in the shares at issue, and they are not necessary for a successful confirmation of his plan or a restructuring under the bankruptcy code. So for those reasons, the motion regarding the stay relief should also be reversed. Ultimately — So, counsel, let me ask you. If we agree with you and say that the rejection of the contract was not appropriate, where do we go from there? Where does Canyon go from there? Ultimately, Canyon would — if the contract cannot be rejected, then Canyon's rights to pursue the State court-specific performance action are renewed. Now, the timing of being able to pursue its rights in the State court-specific performance action would also depend on this Court's ruling on the motion regarding stay relief. So there's really two potential outcomes. One is that the Court could reverse on the rejection issue. It would no longer be rejected, but the automatic stay would still apply until the bankruptcy was discharged. That's a potential outcome. We're also asking this Court to reverse the bankruptcy court's ruling on the motion to stay. If the Court agrees with us on that as well, then it — Canyon could pursue its State court-specific performance action once relieved from the stay. And how does that affect the confirmed plan that's in place then? Our reading of the plan, Judge, is that it would not affect the plan at all. The plan, as confirmed, specifically has contingencies for what would happen if Canyon was successful. Now, that plan that was proposed is the plan that predated the motions that are at issue on this appeal. However, in the debtor's reply brief after this Court's interim motion on the motion to dismiss, essentially they acknowledged that they made a strategic decision not to amend the plan in light of the bankruptcy court's rulings. That is a consequence to be borne by the debtor in the event that this Court reverses either the rejection or the stay. Really, I mean, from Canyon's perspective, in order to be truly successful, it needs to be — the order on rejection needs to be reversed. Being relieved from the stay alone would not do Canyon much good at this point. But additionally, 11 U.S.C. 363M has specific actions which, if consummated within the context of the bankruptcy, cannot be undone by an appeal. And those things really kind of go to the heart of the equitable mootness argument. They are things to do with disposal of the property. If a plan is confirmed and property is disposed of, a later decision on appeal cannot undo that. Rejection of an executory contract is not among the things that 363M protects from later appellate reversal. But if we reverse on the contract rejection, the plan is confirmed, says that the debtor then will pursue a fraudulent transfer action to undo the contract, your position has been in the bankruptcy case that there is no additional obligations and thus any additional consideration beyond the $1.00. Haven't you painted yourself in a corner on — with respect to that fraudulent transfer action at that point? And you wouldn't be going back to State court to litigate? Judge, I think that the heart of your question, if I'm understanding it, kind of goes to what is the consideration of it, and is $1.00 alone sufficient consideration? Are we not admitting that this isn't reasonably equivalent value for the transfer? And the answer to that question is no, because the debtor himself testified and his appraiser also testified that the shares themselves are worth $0.00. So $1.00 is about market value for them. But additionally, they're actually worth less than $0.00, because just based on the DSF debts that he's personally guaranteed, we don't have evidence of DSF debts other than the ones he's personally guaranteed. His testimony is that DSF is worth about $2.7 million, and his scheduled personal guarantees of DSF debts are over $3.3 million. So ultimately, the benefit to the debtor in this was to get unsaddled from all of the debts that he was personally guaranteeing on behalf of DSF, even the unsecured claims that he seeks restructuring of in this case. They're personal credit cards that he's taking out in order to continue to float DSF's financial operations. I mean, it continued managing and continuing to use personal funds to float this company, which is apparently in dire financial straits. That's the reason he came to Canyon in the first place. None of those things can be a benefit to his bankruptcy estate. Well, that issue is not before us, obviously. We don't have to worry about the consideration. That's not a question for us. It's whether or not there were material obligations that remained owing from both sides. And it seems that at times you've admitted that there were additional obligations like being responsible for the company's debts and refinancing the company. So I think the difference here, Judge, is there are obligations under the stock purchase agreement, which is the – that is the specific executory contracted issue in this case. There are also obligations that the owner of a company assumes as part and parcel of being the owner of the company. When Canyon takes control of 90 percent of Dakota Style Foods, it is ifso facto assuming the debts associated with DSF at that point. That's the benefit to the debtor. But those things are contemplated by our ownership of the company. They are not material or – they're not obligations at all under the stock purchase agreement. The agreement whereby we acquire the shares is discrete from the actions that we would take in order to turn the company around, which is what Canyon's business is. But a shareholder is not, just by virtue of being a shareholder, obligated for the company's debts, correct? In terms – well, I mean, the shareholder would own the company and be subject to the encumbrances caused by the debts. Now, on the question of Mr. Dandran's personal guarantees of the debts, the shareholder, Canyon, is essentially relieving debtor from his requirement to pay those debts and to personally guarantee those debts. That was the consideration. That's why he did the deal. But that's a different question from what is actually required in order to close under the stock purchase agreement. Your position is anything post-closing doesn't count as a material obligation? There are post-closing actions that are contemplated which are not terms of the stock purchase agreement. To the extent that there are contemplated actions taken to turn the company around, those things are not part of the agreement whereby we acquire the shares in order to start turning the company around. Because, I mean, essentially, the way I read that sort of line of thinking is that ultimately the contract would be executory unless and until Canyon actually turned Dakota Style Foods around and, you know, did what it set out to do, which is turn the company around. Those are not actually successfully turning the company around. It's not a term of the stock purchase agreement. Debtor came to Canyon in a time of need, asked for a very quick remedy in order to do this. And Canyon's initial response was, if you need a remedy that quick, if you need to buy it that quick, we can't do it for you. And the testimony was that debtor told them it has to be Canyon. They had already had some talks prior to this. It's April of 2023 when things kind of came to a head. But the only deal that Canyon was willing to offer at that point was a $1 option to purchase because the debtor hadn't provided the financials at that point. The actions that the debtor asked Canyon to take, injecting capital into the company being the main one, he was asking them to do it before they owned the company. So from a business standpoint, it never would have been something Canyon agreed to. Canyon agreed to buy the company, to do due diligence, but that wasn't an obligation it ever owed to the seller. Buyer's due diligence or lack thereof is a consequence borne by Canyon. It's not a duty that they ever owed to the debtor on this. But ultimately, the stock purchase agreement's only obligations with respect to Canyon was paying the dollar at closing, which Canyon showed up to and tendered, as well as provide essentially the corporate document showing that Canyon was authorized to make the purchase, which it did along with its letter waiving the closing contingencies. So within the four corners of the agreement, Canyon has done, has substantially performed, and substantial performance is the test in the Eighth Circuit under the Interstate Bakeries case. But the record reflects that Mr. Dandaran testified and believed that he was delivering the contract for the $1 on the condition and with the understanding that Canyon was going to pay $500,000 to Advance Sunflower, it was going to take all these other actions, thus setting up an exception to the parole evidence rule. Correct? Well, the parole evidence rule in South Dakota cannot be used in order to add to the terms of the contract. It can only be done to actually resolve an ambiguity. And there is no ambiguity in the contract with respect to these additional burdens that the bankruptcy court now seeks to impose on Canyon. But there's also an exception for conditions precedent that the one party delivers the contract with the understanding that these certain conditions are going to be complied with, and that's what his testimony went to. I think ultimately, Judge, that the integration clause within the contract itself forecloses these kind of arguments. You're saying that the integration clause overrides the exceptions to the parole evidence rule? I don't think that the parole evidence rule applies to add those additional obligations at all. Kevin Dandaran's subjective belief about what he wanted Canyon to do, when none of those obligations are fulfilled, are found or even contemplated by or implied by the stock purchase agreement, he's simply just asking for terms that he wants done, you know, supplemented into an agreement that he had already signed. You know, his understanding probably should have been resolved at the time of signing, rather than signing it and deciding after the fact that he wished that there had been additional terms. I mean, this entire bankruptcy is born out of Detter deciding after the fact that he felt like he had made a bad bargain. But, again, it's important to remember that the reason that Canyon's involved in this at all is because Detter came to them asking for immediate help. The timing of the deal was entirely, you know, brought upon by the Detter. Canyon did its best to comply with the timeline that the Detter had given them. Ultimately, after the fact, Detter decided he wasn't going to participate in the due diligence obligations. Canyon forced closing, which it was entitled to do. And after Detter refused to show up, the State court action began. So, ultimately, the contracted issue is not executory, because Canyon has substantially performed. Detter has substantial remaining obligations under that agreement. But the Countryman Test says that both parties must have remaining material obligations in order for the contract to be executory. Well, let's go back to the plan for a minute. So the plan has language on pages 11 and 12 that specifically says that on the effective date, Detter shall be restored to its full ownership and dominion over all property and assets owned by it, which property shall be properly dealt with by the plan pursuant to Bankruptcy Code Section 1141C. What does that mean? Well, I think with respect to the Dakota-style food shares, Detter, by signing the stock purchase agreement, has conveyed his equitable interest in the shares to Canyon. In South Dakota, the same thing happens with real estate purchase agreements. When you sign the purchase agreement, between that time and closing, the buyer has an equitable interest in the property and the seller retains legal title. Now, I think the important case to this question is the United States Supreme Court Mission Product Holdings case, where, you know, the court outlined that the bankruptcy estate cannot have more assets than the debtor did at the time the petition was filed. Debtor had already conveyed the equitable interest in the shares. He refused to convey legal title thereafter, but debtor did not come into the bankruptcy with equitable title to the shares at issue. And that Mission Product Holdings case further says that even if a contract is rejected, the interest and property rights already conveyed, Mission Product is about a licensing case. And essentially, the debtor in that case said, now that the contract is rejected, they have to stop using our license. And the U.S. Supreme Court rejected that argument, saying you conveyed that to them prior to the bankruptcy happening. And the same thing is true here. Even, you know, notwithstanding the bankruptcy court's rejection of the SPA, that does not revive debtor's equitable rights in the shares. Those are still canyons to enforce. Thank you, judges. May it please the Court. My name is Ken Edstrom. I'm here on behalf of appellee debtor Kevin Dandaran. I'll refer to him mostly as debtor. Your Honors, even if a debtor had not moved for dismissal of the appeals, it is clear that the arguments in response to the appeals have evolved over time. That is, since the appeals were filed and briefed, the underlying bankruptcy case continued, went through a confirmation hearing, resulting in an approved plan. Those facts have necessarily added to and strengthened the arguments in favor of dismissal. And that is true even if this panel were to rule that Canyon Holdings has standing to continue the appeal and that the claims made in the appeal are not moot. And our arguments today take those facts into account. To counsel's credit, he did not argue that bad faith is a central issue in this case, but I just want to underline that it's clear that any assertion that this Chapter 11 was not filed in good faith in whatever context or in support of whatever argument is an issue that has been decided in the bankruptcy court. And that finding is not an appeal. Canyon Holdings filed a motion to allow an interlocutory appeal of the bankruptcy judges May 23, 2025, denial of their motion to dismiss for bad faith. And this panel denied that motion and provided a roadmap to Canyon Holdings to allow them to preserve the bad faith filing issue by bringing the issue back up in the confirmation hearing. Canyon Holdings had previously objected to the proposed plan, indicating that it was not, the plan was not proposed in good faith under Section 1129A3, and also based on the fact that the whole bankruptcy case was filed in bad faith. Canyon Holdings later dropped their objection to the plan and then failed to file an interlocutory appeal of the issue of whether the bankruptcy was filed in bad faith or the plan was proposed in bad faith. But, counsel, don't we still have that issue wrapped up in the Section 362D1 stay relief motion? Didn't Canyon argue that cause existed for granting relief from the automatic stay and that cause was the bad faith filing? They made that argument, but if you say that the plan was filed in good faith, as was the holding, then there's nothing, then that portion of cause goes away. And that portion of bad faith, which is the argument concerning whether or not the stay should be granted because the whole case was filed in bad faith. It's the same argument, and it goes away. On October 30th, 2025, an uncontested confirmation hearing was held where the bankruptcy court addressed certain minor revisions of the plan. And after those minor adjustments were filed as a new modified plan, the court confirmed the plan on November 13th, and this is at Bankruptcy Docket 316. The confirmation order stated that the court found that the modified plan met all requirements of Section 1191B, which is the case, and was the case here, in order confirming a plan is an order that holds that the debtor has met all the obligations under the applicable provisions of the Bankruptcy Code, in this case including Section 1129A3. And since that confirmation order was not appealed, any order about whether the plan was not proposed in good faith cannot be part of Canyon Holdings' appeal. So, counsel, if we affirm the grant of the contract rejection, does Canyon get paid under the plan? Well, there's no . . . the time for filing proofs of claim has run out. They have withdrawn their proof of claim. They withdrew that as part of the withdrawal of the objection to the plan. The plan, as confirmed, is paying a fine of $1,000,000,000,000,000,000,000,000,000,000,000,000,000. They have allowed claims right now. Canyon Holdings, obviously, is not part of that. They had their chance to participate in this case. After the court ruled that the contract was rejected, the plan was based on the rejection of the contract. And their option at that point was to file a claim with a stated amount, which they never did, even when they had a proof of plan on file. There was no dollar amount associated with it. They failed to do that. So, the plan is confirmed. It's ticking along. There is no appeal of the plan. And so, that's what we're left with. But, counsel, doesn't Article 5D of the plan specifically say that the claim of Black Canyon will either be valued after rejection of the contract signed between debtor and Black Canyon, or after debtor obtains an order from the court vitiating the contract as avoidable transfer? Where on the docket does it show that the claim was valued? There was a motion objecting to the claim that never had to be heard because Canyon Holdings withdrew their claim. So, that part of the contingency in the plan was satisfied. We never had to go there. How do we know that, though? The plan doesn't address that specifically. And that happened before confirmation. So, the plan could have been modified or amended pre-confirmation, I should say, in order to address that that had already occurred. It could have, but it was unnecessary because there was no claim to value. So, the only thing that's in the plan is what happens if the claim is valued and if debtor wins. And debtor did win. So, those contingencies go away. So, where is that objection on the docket? The objection to the claim. I don't have the docket in front of me, Your Honor. But, the objection was filed shortly after the claim was filed, which was early on in the process. And the objection to the claim was going to be heard at the same time as the confirmation of the plan, which was October 30th. So, it never got heard. But, then what does it mean that the plan says, will either be valued after rejection of the contract or after debtor obtains an order? That's a future word. Will be. After the debtor obtains an order on the fraudulent transfer claim, which never had to be decided. It says, the claim of Black Canyon will either be valued after rejection of the contract signed or after debtor obtains an order from the court vitiating the contract as an avoidable transfer. But, that all went away when the claim was withdrawn and the plan was confirmed. There was a contingency that never happened. So, if we reverse on the contract rejection claim, that sends everybody back to the bankruptcy court and the debtor's intention under the plan is to file a fraudulent transfer complaint? Only if Canyon Holdings still had a claim, which they don't. There's no need for a fraudulent transfer. The fraudulent transfer is a fraudulent transfer. The claim was, if Canyon Holdings had established an amount of a claim, the adversary proceeding would have been that it was a fraudulent transfer. So, that never had to happen. It was a proceeding. We were pointing out to the court that the plan, which was obviously filed within 90 days under the sub-5 rules, had to be filed early on in the case when nobody knew what was going to go on. But, if we reverse on the contract rejection, that puts everybody back in the position that you were at the beginning of the case. And, you still have the contract that's there, right? It's not been rejected. I don't know how that. I'm sorry, Your Honor. Does the debtor intend to file a fraudulent transfer complaint in that circumstance? We're talking about something metaphysical because the first thing that would have to happen is the judge would have to rule on what happens to the confirmed plan. Because there is no more estate, because the plan has been confirmed, all of the assets have been returned to the debtor, this argument that the contract rejection is still alive is really a collateral attack on the confirmation of the debtor's plan. If they wanted to say that the plan shouldn't go into effect, they should have filed a claim, fought it out, objected to the plan confirmation. They did not. So, I don't know what Judge Comask would do in that situation, because there's a plan in place that has been confirmed, and everybody's under the understanding that it was confirmed. Well, then, counsel, what does the plan mean when it says in Article 13, on the effective date, debtor shall be restored to its full ownership and dominion over all property and assets owned by it, which property shall be properly dealt with by the plan pursuant to Bankruptcy Code Section 1141C? It's the provision in 1141 that the bankruptcy estate ends as of the date of confirmation. There is no more bankruptcy estate. The property rights are returned to the Chapter 11 debtor subject to the new contract, which is the plan of reorganization. So, it amends, for example, the ability to have administrative claims after that date, because you can only have administrative claims when the estate is still alive. And does that have an effect on the automatic stay? Under 11, I'm not sure I'm answering your question, but let me try. Under Section 1191B, a contested Chapter 11 or a non-consensual Subchapter 5 case is confirmed. The automatic stay stays in place until the plan is, until the plan is, until the plan is completed, and then you have to file your report, and away it goes. No. 362C says, except as provided in some additional subsections, the stay of an act against property of the estate under subsection A of the section continues until such property is no longer property of the estate. Yeah, I think you're asking Congress what they meant when they said in 1191B that the, or the sections under Section 11, under the confirmation of a Subchapter 5, how the automatic stay continues in that instance. So, I don't, I don't have a good answer for that one, Your Honor. Okay. So, let me see if I understand this. So, regardless of whether or not we affirm the contract rejection or, you know, say that that wasn't proper, you still believe that the debtor doesn't owe anything to Canyon because they withdrew their claim? I, that's what the bankruptcy code said, yes. Okay. I just want to make sure I'm clear on that. Let me find where I'm at, Your Honor. Responding to the arguments concerning the countryman test on the executory contract, if the panel chooses not to dismiss the appeal and rules on the merits of the appellant's arguments that the contract in question was executory, it's clear that the bankruptcy court's finding that the contract was executory was not an abuse of discretion. In this case, the contract in question was a business purchase contract that was never closed. It was a contract signed in haste and then within 24 hours repudiated. None of the contingencies in the document were addressed by Canyon Holdings, and nearly all of the other documents described in the contract that would have to have been attached or exchanged at the closing were never prepared. And this fact situation is nearly universally deemed to involve an executory contract. The bankruptcy court in some cases found that there were many, many, many unfulfilled obligations on both sides of the deal that made the contract executory. Besides these items that the bankruptcy court relied on, as we pointed out in our brief, the purchase agreement set out that the debtor would have to enter into a two-year covenant not to compete at closing. That's a document that was not signed or wasn't even drafted. This is a term that's within the four corners of the contract. And although Canyon Holdings said they were ready to deliver payment at closing, where there's been no formal transfer of assets or payment of the consideration for the sale, even if that were solely $1, which it was not, that makes the contract executory. Thus even within the four corners of the contract, the evidence was that the contract was executory. In addition, the bankruptcy court found that the contract was ambiguous because there were many terms in the purchase agreement that were not defined, nor was it clear in the agreement who had the obligation to prepare or approve the various documents. And therefore, Canyon Holdings' claim, repeated here today in oral argument, that they'd waived all contingencies was meaningless, because clearly if there was an obligation owed to the seller, the buyer could not waive those obligations. And further, the debtor made allegations that he was fraudulently induced to enter the contract. Both the ambiguity of the contract and the fraudulent inducement allegations allowed the Court to go beyond the four corners of the contract, despite the constant claims that no such evidence should be allowed. The bankruptcy court found that the promise of the debtor's real estate was approved by the debtor was part of the other good and valuable consideration. It was uncompleted as of the filing of the bankruptcy petition. The bankruptcy court also found that the critical step of Canyon Holdings' obtaining control over the debtor's real estate was another term in the contract that was not completed, thus making the objection the contract executory. And so there were constant findings and references to the facts in the 24-page appearance of the opinion of Judge Comasque. There's no abuse of discretion in the bankruptcy court's decision to allow the contract to be rejected. In connection with the appeal of the denial of Canyon Holdings' motion to relief from stay, as an overview again, the bankruptcy court found that this motion was moot in light of the decision to grant debtor's motion to reject the contract. Since there was no contract left to argue over in State court, there was no other relief of the stay available. The only other option after the contract was rejected was to file their claim for damages. Therefore, if this panel decides to deny the appeal of the court's order declaring that the purchase agreement was an executory contract and that that was properly rejected by the debtor, that would mean that Canyon Holdings' on appeal of the motion for relief from stay should also be denied on that basis. As far as the arguments concerning the motion for relief from stay, there's overwhelming evidence in the record that when it decided there was no stay relief available, even if that appeal, even if that decision was not moot, that motion was not moot. Canyon Holdings argues that they're entitled to pursue their State court remedies, that is, litigate the ownership of Dakota-style foods in State court because the debtor had no equity. And this is an argument that's heard in the Supreme Court and it's heard when secured creditors come into court and say the building is under water or it doesn't produce income. It's an unusual and inapt argument to make by an unsecured creditor where the asset in question is the debtor's sole source of income, then the sole source of payments to be made under the plan. Canyon Holdings argues that the ownership of the Dakota-style foods was not necessary for reorganization, but it was necessary for the State court to decide whether to pay the debtor or not. But that's his sole source of income, and it was necessary. So therefore, it was necessary for reorganization. I'm rushing a little bit because of my time. But Counsel, how is this any different than a Chapter 13 case where there's the possibility that a debtor could become unemployed after confirmation of the plan? The debtor in this case could have gone and gotten employment somewhere else. If the plan, if the contract were put into place, the debtor could have gone and gotten employment somewhere else. If the contract were put into place, he'd be under a two-year covenant not to compete in the only field he's been in for the past 20 years. He's 70 years old. He's on Social Security. He testified that he would not be able to find a job that would pay him as much as being the president of a $10 million food company, and there was no testimony contrary to that. But didn't the debtor also testify he hadn't been paying himself for some number of months? He did testify that he'd been paying himself and indicated that things were coming around and he was going to be paid in the future. So the Court said that was good enough to say that the plan was feasible. There was actually no argument that the plan wasn't feasible, and the plan was confirmed on that basis. Your Honor, I'm out of time. I'd be happy to answer any other questions that you have. Otherwise, just in closing, we think that for the appellants that the ship has sailed on their arguments, the toothpaste is out of the tube and the train has left the station. For the reasons set forth in our briefs to this panel and our arguments here today, we request that the appeals be dismissed for lack of standing and for mootness or that they simply be denied on the merits. Thank you. Mr. Hurd, you have some rebuttal. May it please the Court. Judge Clare, as to your questions there at the end about whether the shares are actually themselves being used for the purposes of the appeal, they are not being sold. They're not being encumbered. They don't themselves, there's no distributions or dividends that debtor takes off of them. And for those reasons, too, the appeal isn't moot, for those same reasons. The shares, the property at issue on appeal, are not contemplated, really any use of them by the plan. But the record clearly reflects that Mr. Danderan testified that he needed to be the owner and be employed, and he was not employed by the company, in order to make the plan work. That was his testimony, but he also testified he did not know whether or not he would lose his job. His own testimony is that whether or not he would be fired after the sale is completely speculative. But, well, I'm not sure that's what the record reflects, but the contract itself that we're arguing over has a two-year non-complete, non-compete, correct? True. And non-solicitation.  And when does that kick in? Presumably upon closing, I think is what the contract says.  Is there anywhere in the contract where there's a mention of an employment or a consulting arrangement with Mr. Danderan post-closing? Not that I'm aware of, Your Honor. So what other conclusion could someone objectively reasonable come to when you're faced with a contract that said, on the closing, you will have no ability to compete with us or solicit any of the employees for two years immediately with no mention of employment or a consultation agreement? Judge, I think that's a fair reading. However, I think that ultimately the issue for the debtor in this case is the question under 362D is whether the specific property at issue is necessary for the reorganization. Again, the property is not being encumbered, it's not being sold. He's not generating income from the shares themselves. It is simply the idea of continued employment. He just needs to continue to make money in order to pay these. That is a separate issue from whether he gets to own Dakota-style foods. Judge Surratt states, you had asked earlier about whether or not Canyon would be paid anything. I think ultimately that goes to why our proof of claim was withdrawn. Our proof of claim as to our liquidate — if this Court affirms the bankruptcy court's position that this is a genuine ruling on contract rejection, our liquidated claim is essentially valueless. I think everyone agrees at this point, based on Detter's testimony as well as the appraiser he hired, the shares themselves are worth nothing. The Canyons' interest in them is because their whole business model is about acquiring companies that are in dire straits and turning them around. You know, Judge Clare, you had talked a little bit about the plan. I think there's just a couple other provisions that I would point out to the Court. Under treatment of Class IV creditors, it states, until the rights of Black Canyon are resolved, no Class V creditor will be paid. Canyon's rights have not yet been resolved by this Court. We perfectly perfected our appeal. If there are no other questions from the Court, Canyon would ask that the Court deny the motion to dismiss from the Detter, would reverse the bankruptcy court's rejection of the stock purchase agreement, and reverse the court's decision denying our relief from stay. Thank you, judges.